# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |  |
|---|---|---|
| UNILOC USA, INC. and<br>UNILOC LUXEMBOURG, S.A., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 2:17-cv-00172-JRG |
| | § | |
| BIG FISH GAMES, INC., | § | **JURY TRIAL REQUESTED** |
| | § | |
| Defendant. | § | |
| | § | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT FOR <u>IMPROPER VENUE AND FAILURE TO STATE A CLAIM</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  INTRODUCTION ...................................................................................................1

II.  UNILOC'S COMPLAINTS SHOULD BE DISMISSED FOR IMPROPER VENUE .................................................................................................................2

    A.  New Legal Standard Determining Venue ...........................................................2

    B.  No Allegations Can Overcome The Legal Conclusion That Venue Cannot Lay Against Big Fish Games In This District.........................................................3

III.  THE ASSERTED PATENTS ARE BARRED BY 35 U.S.C. § 101 BECAUSE THEY RECITE ABSTRACT IDEAS AND LACK AN INVENTIVE CONCEPT ..........5

    A.  Patent Eligibility Is Properly Decided Upon a Motion To Dismiss......................5

    B.  The Law Of Patent Eligibility.............................................................................5

    C.  The Background Of The Asserted Patents Illustrates The Patent-Ineligible Nature Of The Claims .........................................................................................7

        1.  The '228 Patent Acknowledges That Central Servicing Of Software "Bugs" Already Existed ............................................................7

        2.  The '229 Patents Recognizes That Data Copying And The Concept Of Pausing Data Copying Already Existed ..................................9

    D.  Each Of The Asserted Patents Claim Abstract Ideas Under *Alice* Step One.........10

        1.  The '228 Patent Claims the Abstract Idea of Centralized Service.............10

        2.  The '229 Patent Claims the Abstract Idea of Pausing/Resuming The Transfer of Data From One Location to Another ..............................15

        3.  The Asserted Patents Are Not Directed to a Specific Improvement in Computer Technology ...................................................................19

    E.  The Asserted Patents Lack an Inventive Concept Under *Alice* Step Two.............21

        1.  The '228 Patent Does Not Describe Technical Improvement Over the Prior Art ........................................................................................21

        2.  The '229 Patent Does Not Describe Technical Improvement Over the Prior Art ........................................................................................27

IV.  CONCLUSION..................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex. v. DirecTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)................................................................6, 23

*Alice Corp. Pty. Ltd v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014)................................................................ *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom. Inc.,*
    841 F.3d 1288 (Fed. Cir. 2016)................................................................26

*Apple, Inc. v. Ameranth, Inc.,*
    842 F.3d 1229 ................................................................12, 21

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC,*
    827 F.3d 1341 (Fed. Cir. 2016)................................................................7, 26, 27, 29

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................5

*In re Bilski,*
    545 F.3d 943 (Fed. Cir. 2008) (*en banc*), *aff'd*, 130 S. Ct. 3218 (2010) ................5

*buySAFE, Inc. v. Google, Inc.,*
    765 F.3d 1350 (Fed. Cir. 2014)................................................................23

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.,*
    21 F. Supp. 3d 758, 762 (E.D. Tex. 2014)................................................................5, 27

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
    776 F.3d 1343 (Fed. Cir. 2014)................................................................5, 11, 15, 17

*In re Cordis Corp.,*
    769 F.2d 733 (Fed. Cir. 1985)................................................................4

*DDR Holdings, LLC v. Hotels.com, L.P.,*
    773 F.3d 1245 (Fed. Cir. 2014)................................................................26, 29

*eDekka LLC v. 3Balls.com, Inc.,*
    No. 2:15-CV-541 JRG, 2015 WL 5579840 (E.D. Tex. Sept. 21, 2015)................11

*Elec. Power Grp., LLC v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016)................................................................15, 17, 19

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Page(s)**

**Cases**

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)........................................................................6, 19, 20

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016).......................................................................................28

*Fourco Glass Co. v. Transmirra Products Corp.*,
353 U.S. 222 (1957)........................................................................................................2, 3, 4

*Funimation Entm't. v. Does 1-1,427*,
No. 2:11-cv-00269-JRG, 2013 WL 5200453 (E.D. Tex. Sept. 16, 2013) ................................3

*Glob. Equity Mgmt. (SA) Pty. Ltd. v. Alibaba.com, Inc.*,
No. 2:15-cv-01702, 2017 WL 1109865 (E.D. Tex. Mar. 24, 2017) ........................................3

*Harper v. Virginia Dept. of Taxation*,
509 U.S. 86 (1993)........................................................................................................2

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015)........................................................................................6, 22

*Intellectual Ventures I LLC v. Capital One Financial Corp.*,
850 F.3d 1332 (Fed. Cir. 2017)........................................................................................26

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017)........................................................................................27

*Intellectual Ventures I LLC v. J. Crew Group, Inc.*,
No. 6:16-cv-196-JRG, 2016 WL 4591794 (E.D. Tex. Aug. 24, 2016) ................................7

*Intellectual Ventures I, LLC v. Motorola Mobility LLC*,
81 F. Supp. 3d 356, 367 (D. Del. 2015)............................................................................24, 25

*Intellectual Ventures I LLC v. Symantec Corp.*,
No. 13-440-LPS, 2017 WL 639638 (D. Del. Feb. 13, 2017)............................................16, 17

*Kaavo Inc. v. Cognizant Tech. Sol. Corp.*,
No. 14-1192-LPS-CJB, 2016 WL 1268308 (D. Del. Mar. 31, 2016)....................................23

*Kaavo Inc. v. Cognizant Tech. Sol. Corp.*,
No. 14-1192-LPS-CJB, 2016 WL 476730 (D. Del. Feb. 5, 2016) ....................................22, 25

## <u>TABLE OF AUTHORITIES (CONTINUED)</u>

**Page(s)**

**Cases**

*Kay v. J.F.D. Mfg. Co.*,
   261 F.2d 95 (5th Cir. 1958) ...........................................................................4

*Loyalty Conv. Sys. Corp. v. Am. Airlines, Inc.*,
   66 F. Supp. 3d 813, 818 (E.D. Tex. 2014).....................................................4, 11

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)..................................................................19, 20

*Morales v. Square, Inc.*,
   75 F. Supp. 3d 716, 721-22 (W.D. Tex. 2014), *aff'd*, 621 F. App'x 660 (Fed.
   Cir. 2015) .................................................................................................5

*Multimedia Plus, Inc. v. Playerlync LLC*,
   198 F. Supp. 3d 264 ................................................................................12, 13

*Netflix, Inc. v. Rovi Corp.*,
   114 F. Supp. 3d 927 (N.D. Cal. 2015) .............................................................17

*Netflix, Inc. v. Rovi Corp.*,
   670 F. App'x 704 (Fed. Cir. 2016) ..................................................................17

*Network Apparel Group, LP v. Airwave Networks Inc.*,
   154 F. Supp. 3d 467, 477 (W.D. Tex. 2015)......................................................14

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
   No. 6:15-cv-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016)......................10

*NexusCard, Inc. v. The Kroger Co.*,
   No. 2:15-cv-968-JRG-RSP, 2016 WL 1162180 (E.D. Tex. Mar. 24, 2016) ...................14, 17

*OIP Techs., Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 (Fed. Cir.), *cert. denied*, 136 S. Ct. 701 (2015) ........................19, 25

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
   No. 2:16-CV-00152-JRG-RSP, 2017 WL 1177988 (E.D. Tex. Mar. 30, 2017) ...................28

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
   No. 2:16-cv-0152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017) .........................28

*Samsonite Corp. v. Texas Imperial Am., Inc.*,
   No. 3-81-1038-H, 1982 WL 52203 (N.D. Tex. Apr. 15, 1982)................................4

**TABLE OF AUTHORITIES (CONTINUED)**

Page(s)

**Cases**

*Smart Software, Inc. v. PlanningEdge, LLC*,
    192 F. Supp. 3d 243, 251 (D. Mass. 2016) .....................................................15, 28

*Smartflash LLC v. Apple Inc.*,
    No. 2016-1059, 2017 WL 786431 (Fed. Cir. Mar. 1, 2017)....................................24

*TC Heartland LLC v. Kraft Foods Group Brands LLC*,
    No. 16-341, 2017 WL 2216934 (U.S. May 22, 2017) .......................................1, 2, 3

*TDE Petroleum Data Sols., Inc. v. AKM Enter., Inc.*,
    No. H-15-1821, 2015 WL 5311059 (S.D. Tex. Sept. 11, 2015), *aff'd*, 657 F.
    App'x 991 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 1230 (2017) .........................15

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)..............................................................6, 18, 19, 21

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014)................................................................................29

*Uniloc USA, Inc. v. AVG Techs. USA, Inc.*,
    No. 2:16-cv-396-RWS, 2017 WL 1154927 (E.D. Tex. Mar. 28, 2017) ............20, 21

*Uniloc USA, Inc. v. Riot Games, Inc.*,
    No. 2:17-cv-275-JRG, Dkt. 1 ...........................................................................27, 28

*Uniloc USA, Inc. v. Zendesk, Inc.*,
    No. 2:17-cv-00176-JRG, Dkt. 1 ..............................................................................27

**Statutes**

28 U.S.C. § 1391(c) ..........................................................................................................4

28 U.S.C. § 1400(b) ..........................................................................................1, 2, 3, 4, 5

28 U.S.C. § 1404(a) ..........................................................................................................3

28 U.S.C. § 1406(a) ......................................................................................................1, 3

35 U.S.C. § 101.................................................................................1, 5, 11, 15, 16, 27, 29

**Rules**

Fed. R. Civ. P. 12.............................................................................................................5

## TABLE OF AUTHORITIES (CONTINUED)

**Page(s)**

**Rules**

Fed. R. Civ. P. 12(b)(3)..........................................................................................................1, 3, 30

Fed. R. Civ. P. 12(b)(6)..............................................................................................................1, 30

Pursuant to Rules 12(b)(3) and 12(b)(6) of the Federal Rule of Civil Procedure and 28 U.S.C. § 1406(a), Defendant Big Fish Games, Inc. hereby moves to dismiss the Complaint filed by Plaintiffs Uniloc USA, Inc. and Uniloc Luxembourg, S.A. (together, "Uniloc" or "Plaintiffs") for improper venue and for failure to state a claim upon which relief can be granted.

## I.      INTRODUCTION

As a threshold matter, this action cannot proceed in the Eastern District of Texas (or any federal district in Texas).  Following the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, No. 16-341, 2017 WL 2216934 (U.S. May 22, 2017), which is applicable to any case pending on direct review, Big Fish Games is no longer subject to suit for patent infringement in this District under 28 U.S.C. § 1400(b) because Big Fish Games does not "reside" in this District and does not maintain "a regular and established place of business" in this District.  The Court is therefore obligated to dismiss the action or, in the event the Court determines that the interest of justice so requires, transfer the action to the United States District Court for the Western District of Washington.

Even absent dismissal under Rule 12(b)(3) and § 1406(a), the Complaint nevertheless should be dismissed under Rule 12(b)(6) because U.S. Patent Nos. 6,110,228 ("the '228 patent") and 6,564,229 ("the '229 patent") (together, the "Asserted Patents") are directed to patent ineligible subject matter under 35 U.S.C. § 101.  The '228 patent attempts to monopolize age-old ideas about how to improve product "servicing" (*i.e.*, fixes and upgrades).  Businesses, including software vendors, have long known that, in providing servicing or repairs for products sold to customers, such businesses should tailor the servicing and repairs to the customers' particular request.  The '229 patent attempts to monopolize the age-old idea of pausing the transfer of content or information, a practice that businesses (and humans) have applied for centuries to all manner of tasks.  Neither of the Asserted Patents, therefore, is directed to an improvement in the functioning

1

of a computer, but rather are drawn to well-known business practices.  Further, the Asserted Patents claim these abstract ideas in the context of generic computer and computer networking technology, such as centrally managed networks, mainframe computers, PCs, and the like.  The law is clear, however, that simply reciting generic computing technology in patent claims is insufficient to confer subject matter eligibility.  Accordingly, the '228 and '229 patents lack an inventive concept sufficient to confer patent eligibility onto their abstract ideas.

## II.     UNILOC'S COMPLAINTS SHOULD BE DISMISSED FOR IMPROPER VENUE

As a threshold matter, which the Court should decide prior to any further substantive proceedings, the Supreme Court's recent decision in *TC Heartland* renders Uniloc's assertion of venue in the Eastern District of Texas improper.

### A.     New Legal Standard Determining Venue

The patent venue statute, 28 U.S.C. § 1400(b), provides that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." On May 22, 2017, the Supreme Court, in *TC Heartland*, reversed the Federal Circuit's long-standing—and improper—interpretation of § 1400(b) and reaffirmed the Supreme Court's original holding in *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 226, 229 (1957) that the "reside[nce]" of a domestic corporation in § 1400(b) "refers *only* to the State of incorporation." 2017 WL 2216934, at *8.

*TC Heartland* is now "the controlling interpretation of federal law" and therefore "must be given full retroactive effect in cases still open on direct review as to all events, regardless of whether such events predate or postdate [the] announcement of the rule." *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993) (concluding that "a rule of federal law, once announced and applied to the controversy, must be given full retroactive effect by all courts adjudicating federal

law," and extended "to other litigants whose cases were not final").

### B. No Allegations Can Overcome The Legal Conclusion That Venue Cannot Lay Against Big Fish Games In This District

Following *TC Heartland*, Uniloc can proceed with its patent infringement claims against Big Fish Games in this District *only* if Big Fish Games (1) "resides" in this District, or (2) "has committed acts of infringement and has a regular and established place of business" in this District. *See TC Heartland*, 2017 WL 2216934, at *3. Uniloc bears the burden of establishing that venue is proper in this District. *See Funimation Entm't. v. Does 1-1,427*, No. 2:11-cv-00269-JRG, 2013 WL 5200453, at *2 (E.D. Tex. Sept. 16, 2013). Uniloc cannot meet this burden, and the case must be dismissed pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406(a).[1]

Uniloc's Complaint alleges nothing more than that venue is proper in this District because "Big Fish Games is deemed to reside in this judicial district, has committed acts of infringement in this judicial district, and/or has purposely transacted business involving the accused products and/or services in Texas and this judicial district." Dkt. 1 at ¶ 6. But Uniloc acknowledges that Big Fish Games is incorporated in Washington. *See* Dkt. No. 1 at ¶ 4. Thus, Big Fish cannot be deemed to "reside" in Texas or any jurisdiction outside of Washington for the purposes of venue under the first prong of § 1400(b). *See TC Heartland*, 2017 WL 2216934, at *3; *Fourco Glass*, 353 U.S. at 226, 229.

---

[1] Section 1406(a) mandates that the courts "shall" dismiss or transfer when venue is improper. 28 U.S.C. § 1406(a). In the event the Court determines that the interest of justice requires transfer, rather than dismissal, then the action should be transferred to the Western District of Washington because, as Uniloc concedes, Big Fish is incorporated there and maintains its headquarters there. *See* Ex. 1, Declaration of Carey DiJulio ("DiJulio Decl.") at ¶ 2; *see also* Dkt. No. 1 at ¶ 4. In addition, Big Fish's likely relevant documents and all possible relevant witnesses are located there, and proceeding there would be least burdensome to Big Fish given its close proximity to that court. Ex. 1, DiJulio Decl. at ¶¶ 7-10; *see Glob. Equity Mgmt. (SA) Pty. Ltd. v. Alibaba.com, Inc.*, No. 2:15-cv-01702, 2017 WL 1109865, at *2 (E.D. Tex. Mar. 24, 2017) ("Courts consider the same or similar factors" to the § 1404(a) forum non-convenience analysis under § 1406(a)).

Under the second prong of §1400(b), venue in this District is proper as to Big Fish Games only if it "has a regular and established place of business" in this District.  "[I]n determining whether a corporate defendant has a regular and established place of business in a district, the appropriate inquiry is whether the corporate defendant does its business in that district through a permanent and continuous presence there." *In re Cordis Corp.*, 769 F.2d 733, 737 (Fed. Cir. 1985). Merely "doing business" in a district is not sufficient to constitute a "regular and established place of business" under § 1400(b).  *See, e.g.*, *Fourco*, 353 U.S. at 226 (noting Congress's intent to "make corporations [not] suable, in patent infringement cases, where they are merely 'doing business'").

Here, Uniloc does not—and cannot—allege any facts showing that Big Fish Games has "a permanent and continuous presence" in this District.  Plaintiffs' allegations that Big Fish Games conducts business within the district, even if accepted as true, are facially insufficient as a matter of law to establish proper venue.  *See Kay v. J.F.D. Mfg. Co.*, 261 F.2d 95, 96-97 (5th Cir. 1958) (holding that mere sales in a district do not by themselves constitute a "regular and established" place of business in that district); *see also Loyalty Conv. Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 813, 818 (E.D. Tex. 2014) (corporate defendant that had no office, other physical presence, or employees in this District "[did] not have a 'regular and established place of business' in the Eastern District of Texas" under §1400(b), although venue was deemed proper under now-reversed application of § 1391(c)); *Samsonite Corp. v. Texas Imperial Am., Inc.*, No. 3-81-1038-H, 1982 WL 52203, at *2 (N.D. Tex. Apr. 15, 1982) (finding that venue requires "a permanent establishment from which the [entity] regularly conduct[s] business").

Big Fish Games has no offices, operations, employees, agents, or representatives in the Eastern District of Texas or the State of Texas.  *See* Ex. 1, DiJulio Decl. at ¶ 6.  Big Fish Games

4

does not own or lease any real-property in the Eastern District of Texas or the State of Texas. *Id.* Rather, Big Fish Games' "permanent and continuous presence" is Seattle, Washington, where it is headquartered. Accordingly, venue is improper in this District under the second prong of § 1400(b), and the case must be dismissed (or transferred).

## III.   THE ASSERTED PATENTS ARE BARRED BY 35 U.S.C. § 101 BECAUSE THEY RECITE ABSTRACT IDEAS AND LACK AN INVENTIVE CONCEPT

### A.   Patent Eligibility Is Properly Decided Upon a Motion To Dismiss

Patent eligibility under 35 U.S.C. § 101 is a question of law and is a threshold legal inquiry properly considered in a Rule 12 motion to dismiss. *See In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008) (*en banc*), *aff'd*, 130 S. Ct. 3218 (2010); *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 21 F. Supp. 3d 758, 762 (E.D. Tex. 2014) ("[T]he Court determines whether the complaint alleges 'enough facts to state a claim to relief that is plausible on its face.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Federal Circuit frequently affirms patent ineligibility at the pleading stage. *See Content Extraction & Transmission LLC* v. *Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347-49 (Fed. Cir. 2014) (affirming district court holding that abstract software claims were unpatentable at the pleading stage). Moreover, claim construction is not required for the § 101 analysis. *See Content Extraction*, 776 F.3d at 1349; *see also Morales v. Square, Inc.*, 75 F. Supp. 3d 716, 721-22 (W.D. Tex. 2014) ("[T]he Court finds that neither separate claim construction proceedings nor further development of the factual record is required before addressing the § 101 issue." (internal citations omitted)), *aff'd*, 621 F. App'x 660 (Fed. Cir. 2015).

### B.   The Law Of Patent Eligibility

A patent must claim a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Excluded from the scope of patentable inventions are "[l]aws of nature,

natural phenomena, and abstract ideas" because they "are the basic tools of scientific and technological work." *Alice Corp. Pty. Ltd v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks omitted). *Alice* set forth a two-step test to determine patent eligibility.

First, the Court must determine whether the claims at issue are directed to an abstract idea or other patent-ineligible concept. *Id*. at 2355. Abstract ideas ineligible for patenting include, at least, fundamental business practices, *Alice*, 134 S. Ct. at 2357, and methods for organizing human activity, *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). Here, the identification of abstract ideas can be facilitated by "contrast[ing] claims 'directed to an *improvement* in the functioning of a computer' with claims 'simply adding *conventional components* to well-known business practices.'" *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (emphasis added) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)).

Second, if a patent claims an abstract idea, the court must consider whether the claims include additional elements, *i.e.,* an inventive concept, sufficient to "'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2350. An inventive concept cannot be supplied by limiting an abstract idea "to a particular technological environment" or adding "well-understood, routine, conventional activities previously known to the industry." *Id.* at 2358-59 (internal quotation marks omitted). Simply using a computer "does not alter the analysis" in step two of the *Alice* inquiry, as "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S. Ct. at 2357-58; *see also Affinity Labs of Tex. v. DirecTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) ("simply recit[ing] the use of generic features" . . . [i]s not enough" to satisfy *Alice* step two). Similarly, "merely disclos[ing] the use of generic computer network technology to achieve an online

6

variation of a well-established, real-world practice" does not transform an abstract idea into a patent-eligible invention. *Intellectual Ventures I LLC v. J. Crew Group, Inc.*, No. 6:16-cv-196-JRG, 2016 WL 4591794, at *4 (E.D. Tex. Aug. 24, 2016). Instead, the asserted claims must "describe[] how [their] particular arrangement of elements is a technical improvement over prior art ways of" accomplishing the abstract ideas identified in step one of the *Alice* framework. *Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

C.    **The Background Of The Asserted Patents Illustrates The Patent-Ineligible Nature Of The Claims**

1.    **The '228 Patent Acknowledges That Central Servicing Of Software "Bugs" Already Existed**

The '228 patent does not disclose any technical improvements to computers or conventional computer networking. Rather, the '228 patent explicitly acknowledges in the "Description of the Related Art" that computer networks comprising a "central node" and "network of remote locations" existed prior to the alleged invention, with each "remote location" providing customers with access to one or more "application programs." *See* '228 patent at 1:10-34.[2] The '228 patent further recognizes that there were already well-established methods for finding and fixing software "bugs" and making program improvements in these centrally managed computer networks—*i.e.*, "*servicing*" them. *Id.* at 1:39-60 (emphasis added). Additionally, the '228 patent recognizes that the standing preference was to replace only a portion of a program, rather than the whole program: "In distributed systems, the *generally preferred method of program updating is the replacement method*, because typically the programs being serviced comprise many lines of code and the changes between consecutive versions are modest in comparison. *Id*. at 1:56-60 (emphasis added).

---

[2]   Such networks are also referred to herein as "centrally managed networks."

The '228 patent further notes that existing computer hardware could implement the alleged invention, with each remote location comprising "a central processor unit (CPU) 20, an associated operating random access memory (RAM), one or more input/output (I/O) devices such as keyboards, video monitors, printers, and the like, and one or more direct access data storage devices (DASD)." *Id*. at 4:39-44.  Moreover, this remote location CPU could be a commercially-available "mainframe processor such as produced by International Business Machines Corporation ('IBM')" or "a workstation or IBM 'Personal Computer' ('PC') or similar machine." *Id.* at 4:63-5:4.  Likewise, the central node and its "service facility processors" are comprised of existing, off-the-shelf components such as "a mainframe CPU, workstation, file server, or IBM PC-compatible machine." *Id.* at 5:5-6.

The '228 patent thus acknowledges that the named inventors did not invent any networking hardware, conceive of "central node" architecture, or even invent the concept of "servicing" a program via the "replacement method."  Instead, the '228 patent merely describes and claims a desirable outcome for software servicing:  tailoring service provided from a central service location to each customer's needs.  *See id.* at claim 1 ("receiving a request for a computer program service . . . with optional service incorporation instructions of the remote location *customer*" and "providing the results of the requested service . . . back to the *customer*") (emphasis added).  But the claims of the '228 patent do not include any details regarding *how* this desirable outcome is accomplished.  The '228 patent's specification similarly describes the use of generic computing components to allow a customer to "specify a range of operations" that are transmitted to "a service machine at the central site [which] performs the requested service, and the results are provided back to the customer," but does not provide any detail as to how precisely this is accomplished.

*Id.* at 2:54-63.[3]

## 2. The '229 Patents Recognizes That Data Copying And The Concept Of Pausing Data Copying Already Existed

The '229 patent likewise does not disclose any technical improvements to computers or conventional computer networking.  The '229 patent broadly claims a "method and system of moving or copying data within a data processing system."  '229 patent at 1:7-10.  It claims to permit a user to temporarily suspend, and then resume, the copying or moving of data in order to free resources.  For example, claim 1 recites "[a] method for copying data from a source file to a target file on a computer system."  *Id.* at 9:45-46.  The claimed method involves "reading a first data portion from the source file" and "writing the first data portion to the target file."  The method then requires the step of "pausing the copying" in response to a user request and resuming the copy operation by "reading a second data portion" and writing it to the target file.  *Id.* at 9:49-56.

The '229 Patent does not purport to invent data copying operations or the ability to pause and resume those operation.  *See id.* at 1:45-54 ("Programs that copy files, such as may exist in a webpage, from a server to a client computer over the Internet often allow the user to stop the operation. When the copy is resumed, the web browser compares the files needed to be copied with a cache memory …").  Rather, the '229 patent purports to improve upon the prior art by "temporarily suspending the copy operation without canceling the copy operation and without having to re-copy the entire source file at a later time."  *Id.* at 2:4-7.  To accomplish this function, the '229 patent employs an index that retains information about the information being copied and

---

[3] Likewise, the dependent claims are directed to other high-level or prior art concepts. "Researching the service history of the computer program" (claim 2) is described as a process "well-known to those skilled in art."  *Id.* at 19:35-39.  Installation (found in claims 10 and 15) is similarly described as "well-known."  *Id.* at 23:13-16.  Claim 6 adds only well-known user-interface technology, "displaying an enter screen that provides a menu of customer-selectable options."

"points to the next block of data in the source file to be copied" so that the copy operation can be resumed at a later time without unnecessary re-copying or duplication.  *Id.* at 2:13-22; *see also id.* at 4:49-50

The '229 patent also does not purport to disclose any new computer hardware, memory, processors, software or networking.  Rather, as the specification explains, the '229 patent implements the alleged invention using conventional computer systems and hardware.  *See, e.g., id.* at 3:15-27 (source file and target file are stored on generic memory components); 4:3-5 (describing generic computer network); 8:16-53 (describing generic computer hardware components); Figs. 4a & 4b (depicting generic computer systems and Internet); Fig. 8 (depicting generic computer processing components, e.g., "processor," "main memory," "modem," etc.).

**D.**     **Each Of The Asserted Patents Claim Abstract Ideas Under *Alice* Step One[4]**

The asserted patents should be found subject matter ineligible because they are directed to fundamental business practices that were employed long before the priority date of the asserted patents.  *See, e.g., Network Apparel Grp., LP v. Airwave Networks Inc.*, No. 6:15-cv-00134, 2016 WL 4718428, at *6 (W.D. Tex. Mar. 30, 2016) (finding that claims were patent ineligible because "the problem the [patent-at-issue] addresses . . . did exist in the 'brick and mortar' context" and thus "longstanding practices to address this problem predate the Internet").

**1.**     **The '228 Patent Claims the Abstract Idea of Centralized Service**

The '228 patent claims the abstract idea fundamental to commerce of providing customized service to a customer at a central site.  The central concept of the '228 patent—"determining the components of the requested service at the central computer site"—attempts to monopolize the

---

[4] Uniloc alleges infringement of claims 1, 6-7, 10, 18, 25-26, 29, 67-68, and 70-71 of the '228 patent and claims 1-7, 10-13, and 16 of the '229 patent.  Given that, as of this time, Uniloc has not agreed that Defendants will not be accused of infringing any other claims of the '228 or '229 patents, this motion challenges the validity of all claims of the '228 and '229 patents.

basic concept of centralizing service of repairs and upgrades. To take a familiar example, car service centers employ this abstract concept in providing auto service to multiple customers a range of makes, models, and model years of cars:

| '228 Patent, Claim 1[5] | Car Service Comparison |
|---|---|
| 1. A method of applying service to a computer program that is to be executed at a remote location connected to a central computer site of a computer network, the method comprising the steps of: | Car service centers have provided repairs and upgrades to cars of multiple different customers long before the advent of computer networks. |
| interactively receiving a request for a computer program service from a customer at a remote location interface with optional service incorporation instructions of the remote location customer; | Car service centers receive calls from customers requesting a car repair or servicing with specific service instructions (*e.g.*, type of service, such as oil change, or brand of replacement parts) or a specific car upgrade (*e.g.*, installing a new sound system or improved suspension). |
| providing the received request for service over the computer network to a service facility at the central computer site; | The service centers relay service requests to their auto mechanics at the center. |
| determining the components of the requested service at the central computer site; and | The auto mechanics determine the parts needed for the repair or upgrade. |
| providing the results of the requested | The service center provides the service request |

[5]  The other independent claims of the '228 patent are subject to the same analysis.  Independent claims 18 and 47 recite the same limitations as independent claim 1 in "computer network system" and "program storage device readable by a machine at a central computer site."  But patent claims are subject to the same § 101 analysis where they are "merely method claims in the guise of a device" because they "do not overcome the Supreme Court's warning to avoid permitting 'competent draftsmen' to endow abstract claims with patent-eligible status."  *Alice*, 717 F.3d at 1288; *see also Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc*., 66 F. Supp. 3d 829, 844 (E.D. Tex. 2014); *eDekka LLC v. 3Balls.com, Inc.*, No. 2:15-CV-541 JRG, 2015 WL 5579840, at *5 (E.D. Tex. Sept. 21, 2015) (citation omitted) ("Because the system claim and method claim contain only minor differences in terminology [but] require performance of the same basic process, they should rise or fall together.").  And independent claim 67 also recites the same limitations as independent claim 1, but from the perspective of "a remote location" instead of the "central computer cite," and is facially directed to a "program storage device readable by a machine at a remote location."  Accordingly, all independent claims of the '228 patent are substantially similar and linked to the same abstract idea; thus, this motion focuses on representative claim 1.  *See Content Extraction*, 776 F.3d at 1348 (for purposes of the § 101 analysis, claims are deemed representative when they are "substantially similar and linked to the same abstract idea").

11

| '228 Patent, Claim 1[5] | Car Service Comparison |
|---|---|
| service over the computer network back to the customer at the remote location interface. | results to the customer, detailing, *e.g.*, the necessary parts, timing and cost of the repair or upgrade, etc. |

Other courts have found similar claims to be patent ineligible.  For example, in *Apple, Inc. v. Ameranth, Inc*., the Federal Circuit found that the patents-at-issue were directed to the abstract idea of "generating menus on a computer."  842 F.3d 1229, 1240 (Fed. Cir. 2016).  Specifically, the patents-at-issue claimed a first menu identifying, for example, a list of foods available at a restaurant, and a second menu that let the user pick from additional options (*e.g.*, choice of dressing).  *Id.* at 1235.  The claimed invention purportedly allowed customers to order food from a restaurant over the Internet.  *Id.* at 1235.  Nonetheless, the Federal Circuit concluded that this was an abstract idea because the patents-at-issue "do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."  *Id.* at 1241.

Here, too, claim 1 of the '228 patent requires an "interface" that allows a "customer" to submit "optional service incorporation instructions" that are then forwarded to a "central computer site" over a "computer network."  But, just as in *Ameranth*, claim 1 does not specify any particular non-generic software or hardware for generating this "interface," or even how the received "optional service incorporation instructions" are used by the "central computer site."  Instead, claim 1 merely claims the resultant abstract idea of centralized service.

As another example, in *Multimedia Plus, Inc. v. Playerlync LLC*, the court found claims that used a "centralized server for analysis" patent ineligible.  198 F. Supp. 3d 264, 266, 270 (S.D.N.Y. 2016).  Specifically, the claims at issue in *Multimedia* required "collect[ing] answers to questions" as part of an employee training program and "send[ing] [the] answers to a central server to be reviewed by a manager."  *Id.* at 270.  This is analogous to the claims of the '228 patent, which

similarly require "receiving a request for a computer program service from a customer" and

"providing the received request" to a "central computer site" for analysis and "service."  The court

in *Multimedia* found that the claims "attempt to capture the abstract idea of administering a test."

*Id.*  The same result should follow here for the '228 patent, which is directed to the abstract idea

of centralized service.

The dependent claims of the '228 patent are equally directed to abstract ideas related to

providing centralized service to dispersed customers:

- Dependent claim 2 is directed to researching the customer's service history, determining the best repairs available to the customer in light of this history, and evaluating these repairs, *e.g.*, for reliability or availability.[6]  Service centers have long maintained service histories for cars and tied service recommendations to these histories (*e.g.*, recommended that the customer change the car's brakes after seeing when the brakes were last changed).

- Dependent claim 3 further claims presenting the customer with a report of a product's service history and evaluation of available repairs.[7]  Service centers have long provided customers with such service history reports.

- Dependent claim 4 is directed to providing service at the central site in accordance with any service instructions,[8] while dependent claim 5 claims returning the serviced product back to the customer.[9]  Service centers have long repaired or upgraded cars at the service center itself before returning the car to the customer.

- Dependent claims 6, 7, 8, and 9 are directed to providing a menu of service options to the customer, displaying information about the user's last service request, and receiving a new service request through the menu.[10]  Service centers have long presented available services to customers, whether in person, over the phone, or via a website.

- Dependent claim 11 claims providing the service at an alternate site ("slave site"), just as service centers could affiliate themselves with sister service sites, *e.g.*, in the

---

[6]  *See also* '228 patent, claims 14, 19, 32, 37, 41, 48, 54, 57, 58, 64.
[7]  *See also* '228 patent, claims 20, 35, 36, 49, 59.
[8]  *See also* '228 patent, claims 10, 21, 29, 51, 69.
[9]  *See also* '228 patent, claims 22, 24, 50, 60.
[10]  *See also* '228 patent, claims 25, 26, 27, 28, 68, 70, 71, 72, 73.

event of exceeding capacity.[11]

- Dependent claims 12[12] and 13[13] relate, respectively, to changing sets of configuration files and service history files in the process of performing service. Likewise, a car's transmission may be changed during service, and the change would be logged in the car's service history.

- Dependent claims 15,[14] 16,[15] and 17 relate to retrieving the identified program fix from storage at the central computer site or slave site—such retrieval is analogous to retrieval of car parts from a storage bin at a service center or affiliate service shop.

These dependent claims are thus equally directed to abstract ideas.  Moreover, combining the abstract ideas of the independent claims with these abstract ideas found in the dependent claims does not render any claims of the '228 patent less abstract.  *See NexusCard, Inc. v. The Kroger Co.*, No. 2:15-cv-968-JRG-RSP, 2016 WL 1162180, at *5 (E.D. Tex. Mar. 24, 2016) ("[T]he Court finds that describing two abstract ideas in connection with each other … does not cause either abstract idea to then become a concrete thing.").

Beyond these abstract ideas, and as further explained below, the dependent claims of the '228 patent only add conventional computer activity to the foregoing abstract idea.  Such generic computing technology (which is properly analyzed under step two of the *Alice* framework, and discussed in more detail below) does not render the idea underling all claims of the '228 patent less abstract.  *See Network Apparel Group, LP v. Airwave Networks Inc.*, 154 F. Supp. 3d 467, 477 (W.D. Tex. 2015) ("Application of the first step does not include a detailed examination of the asserted claims, either individually or as an ordered combination; that analysis is properly lodged within step two.").

---

[11]   *See also* '228 patent, claims 23, 38, 44, 45, 46, 57, 58, 60, 61.
[12]   *See also* '228 patent, claims 30, 39, 52, 62.
[13]   *See also* '228 patent, claims 31, 40, 53, 63.
[14]   *See also* '228 patent, claims 33, 42, 55, 56, 65.
[15]   *See also* '228 patent, claims 34, 43, 66.

14

The Court should therefore find that the claims of the '228 patent are directed to the abstract idea of providing customized service through a centralized service center.

### 2. The '229 Patent Claims the Abstract Idea of Pausing/Resuming The Transfer of Data From One Location to Another

Independent claim 1 (reproduced in the table below) is representative of the three independent claims.[16] All three independent and all 16 dependent claims are unpatentable under step one of *Alice*. The claimed method includes three basic tasks: (1) copying information from one location to another; (2) pausing the copying of information so that another task may be performed; and (3) resuming the copying of information. The concept of copying and storing data claimed in the '229 patent is a fundamental practice that can be, and has long been, performed by humans in a variety of contexts outside of computers. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) ("[W]e have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.").

The following examples make the abstract nature of the '229 patent apparent:

---

[16] Claims 10 and 16 are the other independent claims. Claim 10 is a system claim reciting generic computer hardware components (*e.g.*, "processors" and "non-volatile storage devices"), including a "copy tool" comprising means for performing substantially the same method recited in claim 1. Claim 16 is directed to "[a] computer program product" and likewise recites means for performing the method steps recited in claim 1. Accordingly, claims 10 and 16 are directed to same abstract idea stated in claim 1 and substantially similar in claim language. *See Content Extraction*, 776 F.3d at 1348. The fact that claims 10 and 16 are recited in means-plus-function terms does not preclude resolution under § 101 at the motion to dismiss stage. *See, e.g., Smart Software, Inc. v. PlanningEdge, LLC*, 192 F. Supp. 3d 243, 251 (D. Mass. 2016) (granting motion to dismiss and stating that "the fact that Claim 10 of the '431 Patent is a means-plus-function claim" does not alter the analysis); *TDE Petroleum Data Sols., Inc. v. AKM Enter., Inc.*, No. H-15-1821, 2015 WL 5311059, at *6 (S.D. Tex. Sept. 11, 2015), *aff'd*, 657 F. App'x 991 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 1230 (2017) (granting motion to dismiss and stating means-plus-function claims ineligible "[s]ince the claims are broad enough to be implemented on a general purpose processor, they are not really limited at all").

| '229 Patent, Claim 1 | Business Comparison | Scribe Comparison |
|---|---|---|
| 1. A method for copying data from a source file to a target file on a computer system, said method comprising: | Businesses have long copied records from one source for storage in a different location using, for example, photo or carbon copying. An employer may, for instance, instruct an employee to copy records for storage in a long-term filing cabinet. | Medieval scribes frequently copied entire manuscripts by hand in order to preserve them. |
| reading a first data portion from the source file; | The employee takes a first original record and scans it into a photocopier. | The scribe would take the original manuscript and read a first line. |
| writing the first data portion to the target file; | The photocopier produces a duplicate record which may be stored in a target file. | The scribe would then manually copy that line onto a new page. |
| pausing the copying in response to a user requesting a pause operation from a user interface, wherein the computer system is available for other processing operations following the pausing; | The employee may pause her photocopying in order to work on other tasks. | This process was laborious and took weeks, if not years. Scribes necessarily paused frequently to allow for other activities, such as sleep. |
| reading a second data portion from the source file in response to the user requesting a resume operation; and | The employee is able to return to scanning at the point where she left off. | The scribe was able to mark his progress and could return to the point in the original manuscript where he last left off. |
| writing the second data portion to the target file. | The employee is able to scan the next record without beginning the entire process anew. | The scribe was able to copy the next line of the manuscript without starting over. |

Courts have found similar claims reciting the concepts of copying, transferring, and storing data to be abstract and patent-ineligible under § 101.  In *Intellectual Ventures I LLC v. Symantec Corp.*, the district court addressed claims directed to copying digital data from a primary network server to non-volatile memory for back-up storage.  No. 13-440-LPS, 2017 WL 639638, at *3 (D. Del. Feb. 13, 2017).  In finding the claims patent ineligible, the court held that "[t]he claims recite the basic steps of copying data from one location to another several times and sending a

confirmation that the data has been received."  *Id.* at *4.

Like the claims in *Symantec*, the claims in the '229 patent are directed to the basic idea of copying information from one location to another.  While the claims in the '229 patent also require the copying operation to be suspended and resumed, this basic function does not make the claims any less abstract.  *See NexusCard*, 2016 WL 1162180, at *5.  As noted in the chart above, the suspension and resumption of tasks is a longstanding concept applied by humans to efficiently manage their time in completing multiple tasks.  Further, the *Symantec* court also found it significant that, like the '229 patent claims, "the claims use existing computer functionality as a tool to better back up data and do not themselves purport to improve anything about the computer or network itself."  *Symantec,* 2017 WL 639638, at *3.

As another point of comparison, the court in *Netflix, Inc. v. Rovi Corp.* invalidated claims drawn to the concept of "creating a 'bookmark' to allow users to start watching a program on one device, then resume the program at the same point on a different type of device." 114 F. Supp. 3d 927, 947-48 (N.D. Cal. 2015), *aff'd*, 670 F. App'x 704 (Fed. Cir. 2016).  As with the claims addressed in *Netflix*, the claims of the '229 patent are drawn to the abstract idea of suspending an operation, maintaining the position of the operation, and resuming the operation at the same position at a later time.

Further, the Federal Circuit has found numerous analogous claims ineligible as directed to the abstract concepts of gathering, organizing, analyzing, and displaying data.  *See, e.g., Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.");  *Elec. Power Grp.*, 830 F.3d at 1353-54 (finding ineligible claims drawn to "collecting information, analyzing it, and displaying certain results of the collection and analysis" and collecting cases invalidating similar claims).  Indeed, when compared to other claims

drawn to data processing addressed by Federal Circuit, the abstract idea disclosed in the '229 patent (pausing and resuming the copying of information) is even broader and more abstract because the claims of the '229 patent do not even require data collection, compilation, analysis, or display of such data; only mere copying of information from one location to another.

Nothing in the dependent claims renders the concepts claimed in the '229 patent non-abstract.  For example, dependent claim 2 specifies that "the first and second data portions each include one or more blocks of data," where dependent claims 8, 9, 14, and 19 are drawn to the concept of selecting the size of the segmented data blocks.  But the manner of organizing the information to be copied does not alter the abstract nature of the concepts claimed.  *See In re TLI Commc'ns.*, 823 F.3d at 613 (finding claims "directed to the abstract idea of classifying and storing digital images in an organized manner" patent-ineligible).  In the real-world examples above, the files could just as easily be segmented into boxes, while the scribe's manuscript could contain chapters and subheadings.

Likewise, dependent claims 3-5, 12, 13 and 17 are merely directed to the abstract idea of maintaining a generic index containing information about the status of the copy operation, such as the next portion of information to be copied (*i.e.*, "a pointer to the second data portion"), the original location of the information, and the location where the information is to be copied.  These concepts, however, are no different than the employee in the file example maintaining a handwritten log of the files to be copied and transferred to storage, those that have been copied but not yet transported, and those already transferred to storage.  Or, in the case of the scribe, utilizing a bookmark would eliminate the need to flip through the manuscript to recall whether the chapter had been read or to go back through the assignment to determine if the text had been copied.  Such tasks are easily done with pen and paper, or even mentally in the minds of the employee or scribe.

Regardless, in the real-world implementation of the abstract concepts described above, the employee or scribe would be able to determine where he or she left off in their respective tasks and resume the tasks accordingly.

Dependent claims 6, 11, and 18 also do not add anything concrete to the abstract concepts claimed. Instead, these claims merely specify that the information copying be implemented "on a remote computer system . . . across a computer network." *See, e.g.,* '229 patent at 10:5-11. Courts have routinely found this sort generic limitation insufficient. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir.), *cert. denied*, 136 S. Ct. 701 (2015) (network communications are "'well-understood, routine, conventional activit[ies]' previously known to the industry").

Finally, dependent claim 7—displaying the amount of data that has been copied—is also drawn to an abstract concept. *See Elec. Power Grp.*, 830 F.3d at 1354 ("[P]resenting the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis."). Accordingly, the dependent claims do not lend anything tangible to the abstract concepts claimed.

### 3. The Asserted Patents Are Not Directed to a Specific Improvement in Computer Technology

The asserted patents are distinguishable from patents that the Federal Circuit recently concluded were subject matter eligible, including in *Enfish*, and *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016). In these cases, the Federal Circuit found that claims were "directed to an improvement in the functioning of a computer," rather than "simply adding conventional components to well-known business practices," as is the case here. *TLI Commc'ns*, 823 F.3d at 612. More specifically, the Asserted Patents are not directed to improving the functioning of either the client or server computer, as in *Enfish* and *McRO*, but instead describe desirable arrangements and interactions between customers and businesses, *i.e.*, "well-known

business practices." Indeed, as demonstrated above, any purported improvement rendered by the asserted claims is realized even in the context of car service centers, businesses, and schools, and other brick-and-mortar institutions.

Further, unlike in *Enfish* and *McRO*, the asserted patents make clear that they are concerned with improving the customer / user experience, and not with improving the functioning of the underlying machines that make up that computer network. The '228 patent claims "receiving a request for a computer program service from a *customer* at a remote location interface with optional service incorporation instructions *of the remote location customer*" and "providing the results of the requested service over the computer network back *to the customer*."[17] The '228 patent, therefore, does not claim any improvement to a computer, and instead is directed to providing information to a "customer." Similarly, the claims of the '229 patent permit the computer system to pause copying "in response to a user requesting a pause" and thereby free the computer to perform some other, unspecified "processing operations." While this may allow a user to prioritize one task over another, this is not even done automatically and, in any event, does not actually improve the processing of the computer itself (*i.e.*, the same tasks are eventually completed in the same amount of time). Further, the claims themselves demonstrate that the claimed concept is not tied to computer technology. Apart from two references generically to "the computer system"—once in the preamble to claim 1 and once in the body of claim 1—and another

---

[17] While the '228 patent mentions "the present invention provides a common method of updating for all products on a given operating system and across all operating systems while minimizing the duplication of program code and improving the efficiency of the service process," '228 patent at 3:6-10, no aspect of these purportedly desirable outcomes is reflected in the claims. Accordingly, these purported advantages are not relevant to the Court's assessment of patent eligibility. *See Uniloc USA, Inc. v. AVG Techs. USA, Inc.*, No. 2:16-cv-396-RWS, 2017 WL 1154927, at *7 (E.D. Tex. Mar. 28, 2017) ("[T]he purported advantages of the claimed invention are not stated in the claims, and unclaimed advantages cannot, in themselves, constitute an inventive concept because any inventive concept must be found in the claims").

single reference to a "user interface," claim 1 does not recite computer hardware.

Accordingly, both the '228 and '229 patents provide "a business benefit rather than a benefit to the client server environment itself." *See Uniloc*, 2017 WL 1154927, at *6. The asserted patents should thus be found to be directed to an abstract ideas under step one of the *Alice* framework.

### E.    The Asserted Patents Lack an Inventive Concept Under *Alice* Step Two

#### 1.    The '228 Patent Does Not Describe Technical Improvement Over the Prior Art

All of the claims of the '228 patent fail *Alice* step two because the claim elements do not disclose an inventive concept sufficient to transform the abstract idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *TLI Commc'ns*, 823 F.3d at 613. Rather, "the components must involve more than performance of well-understood, routine, conventional activities previously known to the industry." *Id.* (citing *Alice*, 134 S. Ct. at 2359) (internal quotations and punctuation omitted).

The claims of the '228 patent recite generic computer equipment like "computer networks," "computer sites," "screens," "nodes," "computer processors," "storage devices," and "interfaces" for exchanging data. These are the fundamental tools of the Internet performing their normal functions, and therefore are non-inventive at *Alice* step two. *See id.* at 615 (affirming invalidity of claims utilizing computer components which "behave exactly as expected according to their ordinary use"); *Ameranth*, 842 F.3d at 1242-43 (finding that "the recited central processing unit, data storage device, and operating system components" were merely "conventional computer components" and therefore did not add an inventive concept). The specification does not set forth any special requirements for this hardware, and in fact concedes that the claimed "remote

locations," "central nodes," and "processors" can comprise any generic workstation or personal computer.  '228 patent at 4:63–5:8.

Likewise, the claimed steps performed by this generic computer hardware are also "well-understood, routine, conventional activities previously known to the industry," amounting to no more than "generic computer[s] perform[ing] generic computer functions," and therefore also cannot supply an inventive concept.  *Alice*, 134 S. Ct. at 2358-59 (internal quotation marks and citations omitted).  For instance, all claim limitations fall into one of the following categories of generic computer functions that other courts have found insufficient to confer patent eligibility:

- "determining," "evaluating," or "identifying" components or services (claims 1, 2, 14, 18, 19, 32, 37, 41, 47, 48, 54, 57, 58, 64, 67).  These claim limitations "simply [] claim a well-known, generic function of computers."  *See Kaavo Inc. v. Cognizant Tech. Sol. Corp.*, No. 14-1192-LPS-CJB,  2016 WL 476730, at *12 (D. Del. Feb. 5, 2016).  Moreover, the '228 patent acknowledges in its "Background of the Invention" that this was well known: "Often, the program being changed will include a relatively extensive amount of code intended as update tools to help the customer incorporate the replacement changes and thereafter run the new updated version."  '228 patent at 1:48-52.

- "interactively receiving" customer input through an "interface" or "menu" (claims 1, 6, 7, 8, 9, 18, 25, 26, 27, 28, 47, 67, 68, 70, 71, 72, 73).  Displaying information, *i.e.*, providing an "interface" or "menu" to a human customer and receiving his or her input is a basic function of generic computers.  *See Intellectual Ventures I*, 792 F.3d at 1370 ("[T]he interactive interface limitation is a generic computer element."); *Affinity Labs*, 838 F.3d at 1261 ("menu of options to the user" was a "conventional" component "used in conventional ways").  Similarly, the specification admits that this was a well-established

concept in the art: "A customer can generally tailor a program product for execution at a particular remote location to obtain proper interfacing with the network and with the remote location system and to invoke specially desired features of the product." '228 patent at 1:30-34.

- "providing" information or "executable code," including "over the computer network" (claims 1, 3, 5, 18, 20, 22, 24, 35, 36, 47, 49, 50, 59, 60, 67).  But receiving a customer request and transmitting a response over a network is a basic function of generic computers. *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").  "Executable code" is equally conventional.  *See Kaavo Inc. v. Cognizant Tech. Sol. Corp.*, No. 14-1192-LPS-CJB, 2016 WL 1268308, at *2 (D. Del. Mar. 31, 2016) ("sending application data" does not provide an inventive concept.).  This is further acknowledged by the specification in its "Background of the Invention": "Different program products might have different methodologies … the changes might be obtained over telecommunication lines such as through modem connections[, or] received directly over the network to which the remote site is connected." '228 patent at 2:24-31.

- "researching [a] service history," "referring to a previous[] . . . request," or "changing . . files" (claims 2, 8, 12, 13, 14, 18, 19, 27, 30, 31, 32, 37, 39, 40, 41, 47, 48, 52, 53, 54, 57, 58, 62, 63, 64, 67, 72).  Such activity, however, "amounts to electronic recordkeeping— one of the most basic functions of a computer."  *See Alice*, 134 S. Ct. at 2359.  The specification acknowledges this as a routine concept in the field, even having a specific descriptive term—"service research": "For example, one fix might require other, preceding fixes to the original program version for proper operation.  … Such information might be

manually obtained in an individual effort by the system programmer… .  The process of obtaining the sequence of fixes that have been created for a software product is known as service research."  '228 patent at 2:14-22.

- "retrieving" a "fix" or "code" "from a storage device" (claims 15, 16, 18, 33, 34, 42, 43, 47, 55, 56, 65, 66, 67).  But storing and retrieving from storage a "fix" or "code" is no more inventive than storing and retrieving other types of data that courts routine find cannot supply an inventive concept.  *See Smartflash LLC v. Apple Inc.*, No. 2016-1059, 2017 WL 786431, at *5 (Fed. Cir. Mar. 1, 2017) ("As such, merely **storing**, transmitting, **retrieving**, and writing data to implement an abstract idea on a computer does not 'transform the nature of the claim' into a patent-eligible application.'") (emphasis added).  Again, the '228 patent recognizes that this is a well-established concept: "Different program products might have different methodologies for obtaining program fixes.  The fixes might be obtained, for example, as copies of code changes recorded onto magnetic tape or disk."  '228 patent at 2:24-31.

- "applying" or "performing" a "service" (claims 4, 10, 18, 21, 29, 47, 51, 67, 69).  Updating a program, however, is not an inventive concept sufficient to confer patent eligibility.  *See Intellectual Ventures I, LLC v. Motorola Mobility LLC,* 81 F. Supp. 3d 356, 367 (D. Del. 2015) (finding "conventional computer processes [that] automate the delivery of software updates" do not confer patent eligibility).[18]  Furthermore, the '228 patent admits that this

---

[18] The claims at issue in *Motorola* are nearly identical to the claims of the '228 patent.  The *Motorola* claims required "(1) presenting a directory of software updates at the user station; (2) selecting and transmitting the desired software updates; and (3) receiving the requested software updates."  *Motorola*, 81 F. Supp. 3d at 365-366.  The claims of the '228 patent likewise require (1) "receiving a request for a computer program service from a customer at a remote location interface with optional service incorporation instructions"; (2) "providing the received request for

is not a novel concept:  "Certain overhead and management functions might be performed by the mainframe computer at the central site."  '228 patent at 1:16-17.

- performing part of the process "at a slave site" (claims 11, 17, 18, 23, 38, 44, 45, 46, 47, 57, 58, 60, 61, 67).  But even implementing an abstract idea in relation to a "cloud environment," without more, is not an inventive concept, much less merely offloading some of the processing to a second generic computer.  *See Kaavo*, 2016 WL 476730, at *8.  Moreover, the '228 patent acknowledges in its "Background of the Invention" that this was well known in the art: "[M]uch of the network data processing is performed at the remote locations by the remote location processors."  '228 patent at 1:17-20.

The fact that these components may lead to increased efficiency compared to, for example, a brick-and-mortar car service center is not sufficient to confer patentability.  *See OIP Techs.*, 788 F.3d at 1363 ("relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible").

Moreover, the "ordered combination" of these claim elements fails to transform the abstract ideas of the claims into patent-eligible applications.  The claim elements merely comprise generic computer components performing basic computer functions, and nothing more.  Thus, these claims are nothing like those held to provide an inventive concept in *Amdocs (Israel) Ltd. v. Openet Telecom. Inc.*, 841 F.3d 1288, 1301-03 (Fed. Cir. 2016) (claims directed to "an unconventional **technological solution** (enhancing data in a distributed fashion) to a **technological problem** (massive record flows which previously required massive databases)" and "depend[ed] upon the invention's **unique** distributed architecture."); *Bascom*, 827 F.3d 1361-52 (patent "claimed a

---

service over the computer network to a service facility at the central computer site"; and (3) "providing the results of the requested service over the computer network back to the customer at the remote location interface."

**technology-based solution** (**not an abstract-idea-based solution** implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems" and "describe[d] how its particular arrangement of elements is **a technical improvement** over prior art); and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (claims necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"). In contrast, the '228 Patent merely discloses generic computer components in a generic arrangement being used precisely as they were designed, to perform a function that was well-known in the computer arts.

First, as discussed above, the problems purportedly addressed by the '228 patent are commonly encountered in the context of, for example, car servicing, and resolved in the same manner (*e.g.*, using a car service center) as in the claims of the '228 patent. Second, the '228 patent claims only aspirational functions and results related to providing service to a computer program at a central location, without actually providing any "technology-based solution" for achieving these results. But simply identifying overarching desirable outcomes applicable to bug fixes and program upgrades without any claim to any specific technical improvements over the prior art does not rise to the level of an inventive and patent-eligible concept. *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) (affirming summary judgment of invalidity under Section 101 because: "[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more."). Any aspects of computer implementation found in the claims are, as explained above, basic computer functions and a natural consequence of generic computer implementation of the abstract idea at issue. *See Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1330-

31 (Fed. Cir. 2017) (distinguishing *Bascom* on the basis that "[t]he use of metafiles . . . is yet another natural consequence of carrying out the abstract idea in a computing environment and is, therefore, also insufficient to transform a patent-ineligible abstract idea into a patent-eligible invention").

Finally, Uniloc does not attribute any special significance to performing the "service" at a "central computer site," since Uniloc alleges that both uploading an update to a server ***and*** downloading an update to a client can infringe the claims of the '228 patent.  *Compare Uniloc USA, Inc. v. Zendesk, Inc.*, No. 2:17-cv-00176-JRG, Dkt. 1 ¶ 13 (E.D. Tex. Mar. 6, 2017) (accusing "upload[ing] an updated zip file" to a server of infringing the '228 patent) *with Uniloc USA, Inc. v. Riot Games, Inc.*, No. 2:17-cv-275-JRG, Dkt. 1 ¶ 19 (E.D. Tex. Apr. 6, 2017) (accusing "downloading" an update to a user computer of infringing the same '228 patent).

### 2. The '229 Patent Does Not Describe Technical Improvement Over the Prior Art

The claims of the '229 patent recite only well-known, common concepts, such as "a source file," "a target file," "index file," "processors," "nonvolatile storage devices," "computer network," and "a computer system."  *See* '229 patent at 9:45-55.  The '229 patent fails to identify any change or enhancement to the normal function of these generic computer structures or any novel methodology for operating those structures.  The '229 patent even recognizes that "moving and copying data from one file to another" is a common task within data processing, *id.* at 1:15-16, and that pre-existing computer systems include "[p]rograms that copy files, such as may exist in a web page, from a server to a client computer over the Internet [that] often allow the user to stop the operation" and resume at a later time, *id.* at 1:45-49.

These components merely perform basic computer functions—*e.g.*, copying information by reading and writing files—in a conventional manner.  This is further confirmed by the

specification.  *See, e.g.,* '229 patent at 3:15-27 (source file and target file are stored on generic memory components), 4:3-5 (describing generic computer network), 8:16-53 (describing generic computer hardware components), Figs. 4a & 4b (generic computer systems and Internet), Fig. 8 (generic computer processing components, *e.g.*, "processor," "main memory," "modem," etc.).

Nor does the claimed "user interface" supply an inventive concept, but instead only operates in a conventional manner by providing a mechanism for user input.  *See FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1096 (Fed. Cir. 2016) ("As we have explained, the use of generic computer elements like a microprocessor or user interface do not alone transform an otherwise abstract idea into patent-eligible subject matter."); *see also* '229 patent at 3:8-12 ("Dialog box 100 could be displayed on a variety of display devices. These devices include computer monitors, personal digital assistants (PDAs), cellular telephones, televisions connected to a computer or a computer network (e.g., WebTV™), and other information display devices.").[19]

Further, the '229 patent concedes that it did not invent copying tools, *see* '229 patent at 1:15-54, and the claim limitations dictate that the "copy tool" recited in claim 10 performs only generic functions, *i.e.*, writing and reading data, and therefore cannot provide the requisite inventive concept for patentability.  *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) ("We do not agree . . . that the addition of merely novel or non-routine components to

---

[19] Because the specification does not disclose any specialized hardware, the tangible structures corresponding to means-plus-function limitations may only encompass the generic computer components recited in the specification.  *See Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.,* No. 2:16-cv-0152-JRG-RSP, 2017 WL 1065938, at *22 (E.D. Tex. Mar. 8, 2017) (finding means-plus-function claims ineligible where the corresponding structures were generic computer components), report and recommendation adopted, No. 2:16-CV-00152-JRG-RSP, 2017 WL 1177988 (E.D. Tex. Mar. 30, 2017); *see also Smart Software, Inc. v. PlanningEdge, LLC,* 192 F. Supp. 3d 243, 251 (D. Mass. 2016) (finding plaintiff failed to identify "any specific corresponding structures in the specification that would plausibly provide a meaningful limitation sufficient to transform an abstract idea into patent-eligible subject matter under § 101").

the claimed idea necessarily turns an abstraction into something concrete.").

Nor are the claims of the '229 patent similar to those found to be eligible in *DDR Holdings* because they do not propose a specific tangible solution to overcoming a problem arising specifically in the realm of computers.  *See* 773 F.3d at 1257.  Rather, the claims in the '229 patent are directed to pausing and resuming the copying of information to manage multiple concurrent task, an idea that has nearly universal applicability beyond the realm of computers.  Moreover, when viewed as an ordered combination, the claim does not add to or change the abstract idea of copying information from one location to another with the ability to suspend and resume the copying operation.  *Cf. Bascom* 827 F.3d at 1350 ("An inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").  Neither the claims of the '229 patent, nor the specification contain any technical details as to how the components of the claims computer systems are arranged in a novel or inventive manner.

## IV.    CONCLUSION

For the above reasons, Defendants respectfully request that this Court dismiss Uniloc's Complaints with prejudice under Fed. R. Civ. P. 12(b)(3) and 12(b)(6) for improper venue and for failure to state a claim.

 Dated:   June 2, 2017                              Respectfully submitted,

                                                    */s/ Douglas F. Stewart*

Douglas F. Stewart
doug.stewart@bracewell.com
Bracewell LLP
701 Fifth Avenue, Suite 6200
Seattle, Washington 98104-7018
(206) 204-6200 (t)
(800) 404-3970 (f)

David J. Ball
david.ball@bracewell.com
Bracewell LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 508-6100 (t)
(800) 404-3970 (f)

Timothy R. Geiger
tim.geiger@bracewell.com
Bracewell LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
(713)-223-2300 (t)
(800)-404-3970 (f)

*Attorneys for Defendant Big Fish Games,, Inc.*

**CERTIFICATE OF COMPLIANCE WITH THE COURT'S**
**<u>35 U.S.C. § 101 MOTION PRACTICE ORDER</u>**

Pursuant to the Court's motion practice order, co-lead counsel for Big Fish Games has met and conferred with lead counsel for Plaintiff and certifies as follows:

The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.

Date: June 2 , 2017

*/s/ Douglas F. Stewart*
Douglas F. Stewart

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document on June 2, 2017.


*/s/ Douglas F. Stewart*
Douglas F. Stewart